UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


LINDSEY N. SELF, ET AL.,              )
                                      )
              Plaintiffs,             )
                                      )        CIVIL ACTION NO.
VS.                                   )
                                      )        3:18-CV-0473-G
CITY OF MANSFIELD, TEXAS, ET AL.,     )
                                      )
              Defendants.             )
                                      )


## MEMORANDUM OPINION AND ORDER

Before the court is the motion of the defendants the City of Mansfield, Texas

(the "City"), Clayton Chandler ("Chandler"), and Tracy Aaron ("Aaron") to dismiss

the plaintiffs' claims against them pursuant to Rule 12(b)(6), F.R. Civ. P. (docket

entry 25). For the following reasons, the motion is granted.

## I. BACKGROUND

On February 27, 2016, City of Mansfield police arrested Jeremiah John

Gillespie ("Gillespie") for "driving under the influence" and placed him in the City of

Mansfield jail ("Mansfield jail") located within the City of Mansfield Law

Enforcement Center, a facility owned and operated by the City by and through the

City of Mansfield City Council. Plaintiffs' First Amended Complaint ("Complaint")

(docket entry 23) ¶¶ 1.01, 5.01, 5.30. Gillespie arrived in a patrol car to the

Mansfield jail at approximately 5:35 p.m. that day.  Mansfield Police Department

Investigation Report ("Malcolm Report") at 3, *attached to* Complaint as Exhibit 4.

Gillespie "was suffering from an acute overdose of a variety of medications" during

his detention.  Complaint ¶ 1.01.  He later died while in custody in the Mansfield jail

from a heart condition aggravated by a drug overdose which the plaintiffs contend

"went untreated for hours due to the unconstitutional policies, practices and customs

of the Mansfield Jail, as adopted and maintained by its policy makers, . . . Chandler

and . . . Aaron which treated drug overdoses identically to alcohol intoxications."

Plaintiffs' Response to Defendants' Second Motion & Brief to Dismiss &

Alternatively Plaintiffs' Motion to Abate and to Compel Defendants to Answer

Plaintiffs' First Amended Complaint ("Response") (docket entry 26) at 2; see also *id*.

at 9.

The plaintiff Lindsey N. Self ("Lindsey Self") was Gillespie's wife at the time

of his death. Complaint ¶ 3.01.  The plaintiff Elin Victoria Self-Gillespie is the

daughter of Lindsey Self and Gillespie.  *Id*. ¶ 3.02.  The plaintiff Paula K. Long

("Paula Long") was Gillespie's mother.  *Id*. ¶ 3.04.

The City is a municipality of the state of Texas and a council-manager form of

government.  *Id*. ¶ 3.05; Response at 7.  At the time of Gillespie's detention and

death, Chandler served as city manager, and Aaron served as chief of police for the

City.  Complaint ¶¶ 3.06, 3.07.  The plaintiffs maintain that the Mansfield City

Council delegated policy making authority to Chandler, and in turn Chandler delegated policy making authority to Aaron.  Response at 7-8.  The plaintiffs further assert that the "adoption of the unconstitutional policies for the operation of the City of Mansfield Jail were adopted by [Chandler and/or Aaron]."  *Id*. at 8.

The plaintiffs contend that throughout Gillespie's detention until the time of his death "he was presenting clear and obvious signs of suffering from a severe and acute drug overdose."  Complaint ¶ 5.30.  The plaintiffs further maintain that "[t]he difference in alcohol intoxication versus a drug overdose was known or should have been known to the [d]efendants at the time of . . . Gillespie's detention at the City of Mansfield Jail and his subsequent death just hours after being taken into custody." *Id*. ¶ 5.06.

At the Mansfield jail, each pretrial detainee goes through "a medical screening process during book-in[.]"  Defendants' Second Motion & Brief to Dismiss ("Motion") (docket entry 25) at 9.  As a part of that process, an administered medical questionnaire "seeks information about medications the arrestee uses, any medical conditions, if they are under the influence or if they have illnesses."  *Id*. at 14.  Jail personnel log that information into a computer system which is reviewed by on-staff nurses.  *Id*. at 9-10, 14.

After Gillespie was searched, he was placed in a holding cell.  Malcolm Report at 3.  Eighteen minutes later, another pretrial detainee in the same cell alerted jail

officials that Gillespie might be suffering from a seizure. *Id*. at 4; Motion at 16; Complaint ¶ 5.44. Nurse Kimberly Barnes ("Barnes") subsequently entered the holding cell, checked Gillespie's vital signs, and spoke to Gillespie, at which time he reported that he had taken the anti-seizure medication Keppra in a dosage of 500 milligrams for past seizures. Motion at 16; Malcolm Report at 4; *see also* Mansfield Police Department Statement Form of Kimberly Barnes ("Barnes Statement") at 1, *attached to* Complaint as Exhibit 7. According to Barnes, Gillespie would not tell her "if he was on any drugs or anything. . . ." Malcolm Report at 9. Gillespie appeared "groggy" in the holding cell, but Barnes found that "very typical for somebody who had a seizure because you can sleep all day after you have a seizure." *Id*. Barnes ordered Gillespie moved from the holding cell to a segregation cell so that he could rest on a mattress on the floor rather than in a bunk bed from which he might fall if he suffered another seizure or became disoriented. *Id*. at 1. Mattresses are not permitted in holding cells. *Id*. Before Gillespie was placed in the segregation cell, Barnes, in the presence of Mansfield jail correctional officer Megan Bailey ("Bailey"), asked Gillespie if he had "been drinking or taking anything, [and] he shook his head 'No.'" Motion at 16.

"Arresting Officer Herlihy told jail staff that Gillespie was drunk . . . [and thus] sought a DUI blood draw because he suspected Gillespie was drunk." *Id*. at 15; *see also* Defendants' Reply Opposing Plaintiffs' Response & Motion (Doc. 26)

Regarding Defendants' Second Motion to Dismiss ("Reply") (docket entry 27) at 5.

Barnes "saw nothing about Gillespie's condition that made him stand out as having

any risk different from any of the other hundreds of intoxicated people she had dealt

with."  Motion at 15.  Jail officials also considered Gillespie drunk and not "under a

drug overdose."  Reply at 5.

After a warrant was issued for the blood draw, jail officials transported

Gillespie to the nurses' station for the blood draw in a restraint chair because the

wheelchair was in use, and Gillespie was unable to stand or walk without assistance.

Motion at 16; Malcolm Report at 4, 7.  Gillespie was not restrained in the chair.

Malcolm Report at 4.  He was in and out of consciousness during the blood draw.

Complaint ¶ 5.29.  After Barnes drew Gillespie's blood, she administered him a 500

milligram tablet of Keppra.  Motion at 16; Complaint ¶ 5.47; Barnes Statement at 1;

Malcolm Report at 5.  The plaintiffs contend that Barnes illegally diagnosed

Gillespie's medical condition and prescribed Keppra, the effects of which contributed

to or exacerbated Gillespie's medical overdose condition.  Complaint ¶¶ 5.51-5.53.

At 7:44 p.m., correctional officers then placed Gillespie back into the same

segregation cell so that he would be monitored more closely (*i.e.*, approximately every

30 minutes).  Motion at 16-17.  Gillespie was told to stay on his side in case he

might vomit and then asphyxiate.  *Id*. at 16; *see also* Mansfield Police Department

Statement Form of Megan Bailey ("Bailey Statement") at 2, *attached to* Complaint as

Exhibit 6. To this directive Gillespie responded, "This isn't my first rodeo." Motion at 17; Bailey Statement at 2. He then covered himself with a blanket. *Id*. The defendants aver that "[a]t this point, Gillespie . . . acted in a way consistent with a person planning to sleep off their alcohol intoxication." Motion at 17. After placing Gillespie in the cell, Bailey and other officers checked on Gillespie at 7:54 p.m., 8:21 p.m., 8:37 p.m., 8:40 p.m., 9:28 p.m., 9:33 p.m., 9:59 p.m., 10:05 p.m., 10:14 p.m., 10:19 p.m. 10:27 p.m., 10:36 p.m., 11:31 p.m., 11:39 p.m., and 11:48 p.m., looking through the cell window and/or making a log entry. Malcolm Report at 5-6; *see also* Bailey Statement at 2. Each time Bailey looked through the cell window, she observed Gillespie "move his leg or the blanket." Bailey Statement at 2. When Barnes entered the cell to take Gillespie's blood pressure at 12:18 a.m., she noted that he was without respirations. Barnes Statement at 1; Bailey Statement at 2; Malcolm Report at 1, 6. Barnes called for an ambulance crew and provided CPR while waiting for the ambulance to arrive.[1] Motion at 17 n.2; Malcolm Report at 6. At 12:28 a.m., medics arrived. Malcolm Report at 6. At 12:53 a.m., Gillespie was pronounced dead at Mansfield Methodist Hospital after "attempted life saving

---

[1] The plaintiffs contend that correctional officers had the right to call for medical transport, but it was the custom that only nurses call for transport. Complaint ¶ 5.93. The defendants, on the other hand, maintain that any jail staff member "who is in contact with a prisoner is authorized to call to send somebody to the hospital even if a subordinate disagrees with a supervisor's decision, if the individual recognizes a medical emergency and thinks no action is being taken." Motion at 14.

measures." *Id*. at 1; see also *id*. at 6. An autopsy revealed that Gillespie "had coronary artery disease that was consistent with hearts of cocaine users." *Id*. at 3. The doctor performing the autopsy reported that Gillespie "would not have lived much longer with that heart." *Id*.

The Mansfield jail processes 20-50 pretrial detainees a day, or 7,300 to 18,250 per year. Motion at 10. Prior to Gillespie's death, pretrial detainees Renee Prestidge Johnson and Wendale Webb died while in custody at the Mansfield jail in 2008 and 2015 respectively. Complaint ¶¶ 5.19-5.21. The plaintiffs maintain that "[t]he circumstances of the deaths Of [sic] Ms. Pretidge [sic] and Mr. Webb were substantially similar to the death of . . . Gillespie [– t]hat is, a drug overdose that went undiagnosed and untreated leading to death." *Id*. ¶ 5.22. Subsequent to Gillespie's death, there have been six custodial deaths at the Mansfield jail, but the plaintiffs do not know if any of these deaths resulted from "unconstitutional policies or customs . . . related to the denial of medical care for persons suffering from an overdose that went undiagnosed and untreated." *Id*. ¶¶ 5.23-5.24.

On February 27, 2018, Lindsey Self (individually, as the next friend of Elin Victoria Self-Gillespie, and as the representative of the estate of Gillespie), and Paula Long filed this suit pursuant to 42 U.S.C. § 1983 ("§ 1983") and TEX. CIV. PRAC. & REM. CODE § 71.001, *et seq.*, and thereafter amended their complaint. *See generally* Complaint. Specifically, the plaintiffs assert violations of Gillespie's rights under the

Fourteenth Amendment to the United States Constitution, alleging that the defendants "deprived . . . Gillespie's clearly established constitutional rights by failing to provide proper medical treatment through institutional policies and customs adopted or maintained by the [d]efendants with deliberate indifference to . . . Gillespie's acute medical needs" while he was incarcerated in the Mansfield jail. *Id*. ¶ 6.06. The plaintiffs allege that the City, as well as Chandler and Aaron, acting under the color of law, violated Gillespie's rights protected by § 1983.[2] *Id*. ¶¶ 6.05, 6.07. The plaintiffs assert that the City "had a duty to promulgate, implement, and maintain constitutionally appropriate policies and/or customs for the safe operation of the City of Mansfield Jail, including the adoption of policies and/or customs to provide constitutionally appropriate medical care to pre-trial detainees in custody at the jail, such as . . . Gillespie." *Id*. ¶ 4.02. The plaintiffs further aver that Chandler and Aaron "through the delegation of authority from the Mansfield City Council, are policymakers for the City of Mansfield regarding the safe and constitutionally appropriate operation of the City of Mansfield Jail. . . . Their actions and inactions in promulgating, implementing and adopting deliberately indifferent policies and customs and their failure to implement appropriate policies and customs in deliberate indifference to the clearly established constitutional rights of . . . Gillespie were the

---

[2] The defendants complain that the plaintiffs do not state if they are suing Chandler and Aaron in their individual or official capacities or both. Motion at 23.

direct moving force that caused his death while in detention at the City of Mansfield Jail." *Id*.; *see also* Response at 8. Specifically, the plaintiffs contend that the policies and customs promulgated by the defendants that were deliberately indifferent to Gillespie's constitutional rights as a pretrial detainee and that were "the moving force behind his death" were as follows.

> A. The policy or custom of treating all intoxications as alcohol intoxications;

> B. The policy or custom of prioritizing obtaining blood draw evidence over the medical needs of pre-trial detainees such as . . . Gillespie;

> C. The policy or custom of having a correctional nurse illegally make a medical diagnosis and prescribe medications;

> D. The failure to have a policy or custom to meet a constitutionally required mandate for medical care, in that there was a failure to have a policy to treat two entirely different and distinct medical conditions in an appropriate manner;

> E. The failure to have a policy or custom to train correctional officers and correctional nurses about the difference between alcohol intoxications and drug overdose intoxications and their treatment;

> F. The policy or custom of having correctional officer observe persons placed in segregation for acute medical conditions from the window of the segregation cell rather than have them enter the cell and make physical contact with the pre-trial detainee to evaluate the progression of their medical condition;

G.     The policy or custom to have unqualified correctional officers monitor the medical condition of pre-trial detainees who were segregated for medical reasons instead of correctional nurses who could take vital signs and properly monitor the worsening of an acute medical condition. . . .

Complaint ¶ 5.103.

The defendants summarize these claims against them as follows.

1.     Defendants were deliberately indifferent in failing to adopt constitutionally appropriate policies and customs for safe operation of the Mansfield jail. . . .

2.     Defendants were deliberately indifferent in failing to provide adequate policies, practices or procedures in order to train personnel to evaluate and treat the medical condition of a drug overdose. . . .

3.     Defendants are liable because jail personnel were deliberately indifferent in their implementation of policies, procedures and practices regarding decedent Gillespie's clearly established constitutional rights to medical care. . . .

4.     Alleged violation of Plaintiffs' substantive due process rights, as the wife, mother and children of decedent, in violation of the Eighth and Fourteenth Amendments. . . .

5.     Alleged negligence, gross negligence and deliberate indifference pursuant to Tex. Civ. Prac. & Rem. Code §§ 71.001 et seq. . . .

Motion at 3-4.

The defendants maintain that the plaintiffs have failed to state a claim for

which relief can be granted, and Chandler and Aaron insist that the plaintiffs' § 1983

claims should be dismissed because they are entitled to qualified immunity. See generally *id*. Chandler and Aaron further contend that the plaintiffs' state law claims fail because they are barred by TEX. CIV. PRAC. & REM. CODE § 101.106. *Id*. at 3; see also *id*. at 23-24. The City contends that the plaintiffs merely assert "a laundry list of formulaic recitations of alleged policies[,]" *id*. at 7, in an attempt "to equate the actions of jail employees with actions that [p]laintiffs want to charge to the City." *Id*. at 6. The City further argues that it is entitled to sovereign immunity on the plaintiffs' state law claims. *Id*. at 24-25.

## II. ANALYSIS

### A. Standard for Determination under Rule 12(b)(6)

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiffs must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)), *cert. denied*, 552 U.S. 1182 (2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations, quotation marks, and brackets omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all

the allegations in the complaint are true (even if doubtful in fact)." *In re Katrina Canal*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted). "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id*. (quoting *Martin K. Eby Construction Company, Inc. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)) (internal quotation marks omitted).

The Supreme Court has prescribed a "two-pronged approach" to determine whether a complaint fails to state a claim under Rule 12(b)(6). See *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The court must "begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 679. The court should then assume the veracity of any well-pleaded allegations and "determine whether they plausibly give rise to an entitlement of relief." *Id*. The plausibility principle does not convert the Rule 8(a)(2) notice pleading to a "probability requirement," but "a sheer possibility that a defendant has acted unlawfully" will not defeat a motion to dismiss. *Id*. at 678. The plaintiffs must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (alteration in original) (quoting FED. R. CIV. P. 8(a)(2)). The

court, drawing on its judicial experience and common sense, must undertake the "context-specific task" of determining whether the plaintiffs' allegations "nudge" their claims against the defendants "across the line from conceivable to plausible." See *id*. at 679, 683.

## B.  Claims Under § 1983

To state a valid claim under § 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327, 330-31 (1986), and *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 155 (1978)).  If the plaintiffs fail to state underlying federal constitutional claims upon which relief can be granted, the court need not entertain a municipal liability claim or decide a qualified immunity issue.  *Mississippi v. Rinehart*, No. 1:15-CV-00077-GHD-DAS, 2016 WL 4703516, at *9 (N.D. Miss. Sept. 7, 2016).

### 1.  Defendants Chandler and Aaron

The threshold question the court must answer is whether the defendant government officials are entitled to qualified immunity on the federal claims.  See *Mangieri v. Clifton*, 29 F.3d 1012, 1015 (5th Cir. 1994) (citing *Siegert v. Gilley*, 500 U.S. 226, 231-33 (1991), and *Brewer v. Wilkinson*, 3 F.3d 816, 820 (5th Cir. 1993),

*cert. denied*, 510 U.S. 1123 (1994)).  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Once the defendants have raised this defense, the burden shifts to the plaintiffs to show that the individual defendants are not entitled to qualified immunity.  See *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) ("When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense."), *cert. denied*, 537 U.S. 1232 (2003).  It is not enough for the plaintiffs to allege that a government official violated abstract constitutional rights in a broad generalized sense.  *Brown v. Glossip*, 878 F.2d 871, 874 (5th Cir. 1989).  The plaintiffs must allege particularized facts which, if proved, would defeat a qualified immunity defense.  *Id*. at 874-75.

To overcome a motion to dismiss based on qualified immunity, the plaintiffs must demonstrate two things.[3]  First, the plaintiffs must have alleged facts sufficient

---

[3]    Courts in this Circuit often add a third step in the inquiry to assess whether a governmental official is entitled to qualified immunity.  Part three of the inquiry is a determination of "whether the record indicates that the violation occurred, or gives rise to a genuine issue of material fact as to whether the defendant actually engaged in the conduct that [is alleged to have] violated the clearly established right."  *Grotz v. City of Grapvine* [sic], No. 4:08-CV-344-Y, 2009 WL 3398890, at *7 (N.D. Tex. Oct. 22, 2009) (Means, J.) (quoting *Conroe Creosoting Company v. Montgomery County*, 249 F.3d 337, 340 (5th Cir. 2001); see also *id*. ("[T]he third portion of the Fifth

to show that the individual defendants' conduct violated a clearly established constitutional right.  See *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Wilson v. Layne*, 526 U.S. 603, 609 (1999) ("A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all. . . .'") (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)); see also *Morin v. Caire*, 77 F.3d 116, 121 (5th Cir. 1996) ("[W]hen a plaintiff sues a public official under § 1983, the district court must insist on heightened pleading by the plaintiff.") (citing *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995) (en banc)).  Second, the plaintiffs must show that the constitutional right was clearly established at the time of the defendants' alleged misconduct. *Pearson*, 555 U.S. at 232.  This inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken."  *Wilson*, 526 U.S. at 614 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).  Government officials are entitled to the defense of qualified immunity "if their decision was reasonable, albeit mistaken."  *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993) (per curiam) (citation omitted), *cert. denied*, 511 U.S. 1019 (1994).  "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those

---

Circuit's test is implicit in the first portion of the Supreme Court's articulation of the test. . . .").  Here, the court finds that neither Chandler nor Aaron engaged in conduct to violate a clearly established constitutional right.

who knowingly violate the law.'" *Id.* This court is permitted to consider the two prongs of the qualified immunity test in any order. *Pearson*, 555 U.S. at 236.

a. <u>Violation of a Clearly Established Constitutional Right</u>

"To act with deliberate indifference, a state actor must consciously disregard a known and excessive risk to the victim's health and safety." *Hernandez ex rel. Hernandez v. Texas Department of Protective and Regulatory Services*, 380 F.3d 872, 880 (5th Cir. 2004) (citations omitted). The deliberate indifference standard is an extremely high one. *Sanchez v. Young County, Texas*, 866 F.3d 274, 280 (5th Cir. 2017) (citing *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir.), *cert. denied*, 528 U.S. 906 (1999)), *cert. denied*, __ U.S. __, 139 S. Ct. 126 (2018). Conduct classified as deliberately indifferent "must be more than mere or even gross negligence" to establish a violation of a clearly established constitutional right. *Hare v. City of Corinth, Mississippi*, 74 F.3d 633, 645 (5th Cir. 1996) (en banc).

The Fifth Circuit has established that the "deliberate indifference" standard applies to a pretrial detainee's claims involving the denial of medical care under § 1983. See, *e.g.*, *id.* at 647-48. Under this standard, an episodic act or omission by a governmental employee does not violate a pretrial detainee's constitutional right to medical care unless the pretrial detainee demonstrates that the employee acted or failed to act with subjective deliberate indifference to his serious medical needs.[4] *Id.*

---

[4] The defendants complain that the "Plaintiffs' Response does not clearly explain whether they are pursuing Defendants under an episodic acts or omissions

at 643, 647-48. "'For an official to act with deliberate indifference, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Such indifference on the part of a government employee can be evidenced by intentionally denying or delaying access to medical care or by intentionally interfering with the

---

theory or whether they are pursuing Defendants under a conditions of confinement theory – or pursuing both theories." Reply at 3. Under either theory, the plaintiffs' claims fail. "Constitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a 'condition of confinement' or as an 'episodic act or omission [by one or more state officials].'" *Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009) (citing *Hare*, 74 F.3d 633, 644-45); see also *Sanchez*, 866 F.3d at 279 ("The 'unconstitutional conditions' theory rests on the idea that the County has imposed what amounts to punishment in advance of trial on pretrial detainees[.] . . . The 'episodic acts and omissions' theory, in contrast, requires a finding that particular jailers acted or failed to act with deliberate indifference to the detainee's needs."); *Estate of Henson v. Wichita County, Texas*, 795 F.3d 456, 462-64 (5th Cir. 2015). An attack on a condition of confinement is a challenge to "general conditions, practices, rules, or restrictions of pretrial confinement." *Hare*, 74 F.3d at 644; see also *Estate of Henson*, 795 F.3d at 463 ("When a plaintiff is challenging a condition of confinement, this court applies the test established by the Supreme Court in *Bell v. Wolfish*, and asks whether the condition is 'reasonably related to a legitimate governmental objective.'"). "An episodic-acts-or-omissions claim, by contrast, 'faults specific jail officials for their acts or omissions.'" *Estate of Henson*, 795 F.3d at 463 (quoting *Shepherd*, 591 F.3d at 452); see also *Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011). It is clear that the plaintiffs have brought an episodic acts or omissions claim. The court assumes from the plaintiffs' response to the defendants' motion to dismiss (see, *e.g.*, Response at 11-12), that the plaintiffs have also brought a condition of confinement claim, but the court finds that Gillespie was not subjected to unconstitutional conditions of confinement.

treatment prescribed. *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)).

Additionally, liability requires "more than ordinary lack of due care for the prisoner's

interests or safety." *Farmer*, 511 U.S. at 835 (quoting *Whitley v. Albers*, 475 U.S. 312,

319 (1986)). In other words, mere negligence on the part of a governmental

employee does not constitute deliberate indifference. *Wilson v. Seiter*, 501 U.S. 294,

305 (1991); see also *Trevino v. Hinz*, 751 Fed. Appx. 551, 554 (5th Cir. 2018) (per

curiam) ("We doubt that Plaintiffs have alleged facts giving rise to deliberate

indifference as to Officers Hauck and Hinz. Even read favorably to Plaintiffs, their

allegations may depict negligence on the officers' part in not initially realizing the

gravity of Trevino's condition and in not calling an ambulance sooner."). That is, a

"[state actor] must have the subjective intent to cause harm." *Mace v. City of*

*Palestine*, 333 F.3d 621, 626 (5th Cir. 2003) (citing *Wagner v. Bay City*, 227 F.3d

316, 324 (5th Cir. 2000)); see generally *Pengelly v. City of Hurst, Texas*, No. 4:17-CV-

0281-O (N.D. Tex. March 16, 2018) (O'Connor, J.) (docket entry 56) (unpublished

opinion). "Unsuccessful medical treatment, acts of negligence, or medical

malpractice do not constitute deliberate indifference[.]" *Gobert v. Caldwell*, 463 F.3d

339, 346 (5th Cir. 2006); *Hunt v. Pierson*, 730 Fed. Appx. 210, 213 (5th Cir. 2018)

(per curiam). "It is indisputable that an incorrect diagnosis by prison medical

personnel does not suffice to state a claim for deliberate indifference." *Domino v.*

*Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (citing *Johnson*

*v. Treen*, 759 F.2d 1236, 1238 (5th Cir.1985)); see also *Trevino*, 751 Fed. Appx. at 555 ("[A]n officer's failure to immediately recognize ambiguous symptoms as a medical emergency does not amount to deliberate indifference.").  The plaintiffs have failed to show that jail employees acted with deliberate indifference or pursuant to a policy or established custom to deny adequate medical care to pretrial detainees.  See generally *Grotz*, 2009 WL 3398890.  Because the plaintiffs have not proved that jail employees acted with deliberate indifference, there is no underlying constitutional violation in this case.  See *Hines v. Henson*, 293 Fed. Appx. 261, 263 (5th Cir. 2008) (per curiam).

The plaintiffs do not contend that either Chandler or Aaron was involved in the direct care of Gillespie.  Response at 10.  The defendants maintain that Chandler and Aaron cannot be held liable under § 1983 for the actions of City employees. Motion at 20.  The plaintiffs claim that the "Defendant [sic] incorrectly asserts in their Motion to Dismiss that Plaintiffs are trying to hold the City of Mansfield liable under a theory of respondeat superior for the conduct of the correctional officers and correctional nurse. . . . Supervisory officials, such as Defendants Chandler and Tracy, are accountable for their own acts of deliberate indifference or for implementing unconstitutional policies and customs that result in injury to pretrial detainees." Response at 10.

Section 1983 does not impose vicarious liability on supervisory government officials solely because of a supervisory relationship with a person violating § 1983. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 692 (1978); *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987). Neither Chandler nor Aaron, therefore, can be held liable under § 1983 simply because he supervised or failed to train City employees.

There is supervisory liability under § 1983, however, if either (1) the supervisor had personal involvement in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's conduct and the constitutional violation. *Thompkins*, 828 F.2d at 304; *Smith*, 158 F.3d at 911. For example, a supervisor can be found liable under § 1983 if the plaintiff shows that "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (quoting *Smith*, 158 F.3d at 911-12 ). Without overt participation in a violation, moreover, a supervisory official can be liable under § 1983 if he or she has implemented a policy that is so deficient that the policy itself is a violation of constitutional rights. *Thompkins*, 828 F.2d at 304 (citations omitted). Alternatively, there is supervisory liability under § 1983 where the offending practices are so well-

settled as to constitute a custom, even if they are not official policy. *Monell*, 436 U.S. at 690-91. If these conditions are not met, supervisory officials are immune from liability under § 1983.

As stated above, where a defense of immunity can be raised, the plaintiffs are required to state facts which, if proved, would defeat the claim of immunity. When read as broadly as possible, the plaintiffs' pleadings allege no facts sufficient to defeat the qualified immunity defense of Chandler or Aaron. The plaintiffs conclusorily assert that Chandler and Aaron are policymakers based on statements that the City Council delegated authority to them. Additionally, there is no suggestion that either Chandler or Aaron overtly participated in a violation of constitutional rights or failed to train or supervise City employees, nor have the plaintiffs shown that Chandler or Aaron implemented a policy that is so deficient that the policy itself is a violation of constitutional rights. See *Mouille v. City of Live Oak, Texas*, 977 F.2d 924, 929 (5th Cir. 1992), *cert. denied*, 508 U.S. 951 (1993); see also *Hines*, 293 Fed. Appx. at 264. The record does not show that jail officials, Chandler, or Aaron acted with deliberate indifference to Gillespie's medical needs or to a known, widespread pattern of constitutional violations. Even if the court assumes *arguendo* that the actions of Chandler or Aaron were negligent, the plaintiffs have not shown that those actions constitute a violation of Gillespie's constitutional rights. Thus, the plaintiffs have not shown a right to relief. See *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir.

1991) (per curiam); see also *Hines*, 293 Fed. Appx. at 263 ("Because we find that [the plaintiff] has not succeeded in establishing deliberate indifference by the county jail officials, we conclude that there was no constitutional violation under the facts of this case."). Chandler and Aaron are thus entitled to qualified immunity from the plaintiffs' § 1983 claims. Accordingly, the motion to dismiss for failure to state a claim under § 1983 is granted as to Chandler and Aaron.

b. <u>Objective Reasonableness</u>

As stated above, a plaintiff must satisfy the first step of the qualified immunity analysis – that an established constitutional right was violated – before reaching the second step. *Grotz*, 2009 WL 3398890, at *13. The court has determined that no such violation occurred; therefore, resolution of the issue of the objective reasonableness of Chandler's and Aaron's conduct is unnecessary.

2. <u>Defendant City</u>[5]

The plaintiffs' federal claims against the City also must be dismissed. "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."

---

[5] The § 1983 claims against Aaron and Chandler in their official capacities is, in essence, an action against the City. See *Hafer v. Melo*, 502 U.S. 21, 25-28 (1991); *Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir. 1996). Accordingly, the defendants' motion to dismiss the plaintiffs' claims brought against Aaron and Chandler in their official capacities is granted as duplicative of the claims against the City.

*Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir.) (citing *Monell*, 436 U.S. at 694)), *cert. denied*, 534 U.S. 820 (2001). A plaintiff seeking to impose liability upon a municipality must establish each of these three elements.

Though the plaintiffs allege that Chandler and Aaron are policymakers, a municipality may be liable under § 1983 only if the execution of one of its customs or policies deprives a plaintiff of his constitutional rights. *Monell*, 436 U.S. at 691. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Although an official policy which is itself unconstitutional clearly subjects a municipality to § 1983 liability, "even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski*, 237 F.3d at 579 (citing *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 407 (1997)). A city cannot be liable under § 1983, however, merely because it employed a tortfeasor.[6] See *Monell*, 436 U.S. at 691; *Bryan County*, 520 at

_____

[6]    The defendants maintain that '[i]t is well settled that the Defendant City cannot be held liable for civil rights violations under a theory of Respondeat Superior." Motion at 4. In response, the plaintiffs assert that "[t]he Defendants incorrectly assert that this case is a *Monell* case attempting to hold the City of Mansfield responsible for actions of its employees under a theory of respondeat superior. The . . . [c]omplaint sets forth clearly the policy and/or custom made the basis of the complaint." Response at 5; see also *id*. at 10.

403. Rather, "[t]he 'official policy' requirement . . . make[s][it] clear that municipality liability [under § 1983] is limited to action for which the municipality is actually responsible . . . – that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986). The policy or custom must be "the moving force of the constitutional violation." *Monell*, 436 U.S. at 694. Although the plaintiffs have identified no official written policy regarding their § 1983 claims, such a policy may nevertheless exist in the form of an unwritten custom. However, a municipality "cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quoting *Hicks-Fields v. Harris County, Texas*, 860 F.3d 803, 808 (5th Cir.), *cert. denied*, __ U.S. __, 138 S. Ct. 510 (2017)). The custom or policy must actually be that of the City's governing body before the City can be held liable. See *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984) (en banc), *cert. denied*, 472 U.S. 1016 (1985).

"'Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy' as required for municipal section 1983 liability." *Gates v. Texas Department of Protective and Regulatory Services*, 537 F.3d 404, 437 (5th Cir. 2008) (quoting *Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir. 1995) (quoting *Bennett*, 728 F.2d at 768 n.3)); see also *Piotrowski*, 237 F.3d at 578 ("[T]he

unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability.") (citations omitted). "'[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Pembaur*, 475 U.S. at 483-84).

The Fifth Circuit defines official policy as:

> 1.     A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

> 2.     A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.  Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.  Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.) (per curiam), *aff'd in relevant part*, 739 F.2d 993 (5th Cir. 1984) (en banc).

"To survive a motion to dismiss, a complaint's 'description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be

conclusory; it must contain specific facts.'" *Balle v. Nueces County, Texas*, 690 Fed. Appx. 847, 852 (5th Cir. 2017) (quoting *Spiller v. City of Texas City Police Department*, 130 F.3d 162, 167 (5th Cir. 1997)). That is, pleadings must "make specific factual allegations that allow a court to reasonably infer that a policy or practice exists and that the alleged policy or practice was the moving force behind municipal employees' deliberate indifference to an inmate's serious medical needs." *Id*.; see also *Peña*, 879 F.3d at 622 ("[A] plaintiff must do more than describe the incident that gave rise to his injury."). The plaintiffs must "establish both the causal link ('moving force') and the city's degree of culpability ('deliberate indifference' to federally protected rights). These requirements must not be diluted, for '[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) (quoting *Bryan County*, 520 U.S. at 415)), *cert. granted in part*, 525 U.S. 1098 (1999) and *cert. dismissed in part*, 526 U.S. 1083 (1999).

Because the court has held there were no underlying constitutional violations, the City cannot be held liable for Gillespie's death. See *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *Evans v. City of Dallas*, No. 3:16-CV-0561-L, 2017 WL 958607, at *5 (N.D. Tex. Mar. 13, 2017) (Lindsay, J.) ("Plaintiffs' pleadings fall short of adequately alleging an underlying Fourteenth Amendment violation by the [emergency medical technicians]. As such, Plaintiffs have no claim

against the City."); *Grotz*, 2009 WL 3398890, at *12-*13.  Even if it is assumed *arguendo* that the plaintiffs had adequately pleaded constitutional violations, when the facts are read in the light most favorable to the plaintiffs, they do not tend to show any policy or custom of the City which caused the alleged injury in this case.  See *Campbell*, 43 F.3d at 977.  Nothing in the record provides evidence of a longstanding pattern of repeated constitutional violations.  Even if the plaintiffs, as the parties seeking to impose liability upon the City, established that Aaron and/or Chandler acted as a policymaker for the City, the plaintiffs have adduced no evidence that the City promulgated a municipal policy with deliberate indifference to its potential for causing constitutional violations.  See *Morris v. City of Alvin, Texas*, 950 F. Supp. 804, 806 (S.D. Tex. 1997) ("[T]he City of Alvin was not required to train its jailers how to recognize the ambiguous signs of drug overdose.  While a medical doctor might have recognized Morris' condition, the city and its jailers were not constitutionally required to provide such a high standard of care.  Moreover, it cannot be inferred that any additional training of or screening by the jail staff would have *prevented* Mrs. Morris' drug overdose.") (emphasis in the original).

The plaintiffs also fail to state a plausible claim for failure to train.  In failure to train cases, the plaintiff can prove the existence of a municipal custom or policy of deliberate indifference to an individual's rights by showing that "(1) the municipality's training policy or procedure was inadequate; (2) the inadequate

training policy was a 'moving force' in causing violation of plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy." *Shumpert v. City of Tupelo*, 905 F.3d 310, 317 (5th Cir. 2018) (citations omitted), *cert. denied*, __ U.S. __, 2019 WL 659873 (Feb. 19, 2019). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983"; however, the failure to train must amount to deliberate indifference. *Connick*, 563 U.S. at 61.

The plaintiffs have not presented any evidence, however, that the City deliberately chose an inadequate training program. See *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("[I]t is . . . difficult in one sense even to accept the submission that someone pursues a 'policy' of 'inadequate training,' unless evidence be adduced which proves that the inadequacies resulted from conscious choice – that is, proof that the policymakers deliberately chose a training program which would prove inadequate."); *City of Canton*, 489 U.S. at 389 ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality – a 'policy' . . . can a city be liable for such a failure under § 1983."). Nor is there evidence of persistent, repeated, and constant violations of constitutional rights by virtue of this alleged failure to train.

As stated previously, the plaintiffs have failed to state any deprivation of Gillespie's constitutional rights. Moreover, the plaintiffs have failed to show that the evidence in the record is sufficient to support a resolution in their favor of the issues of fact relating to the City's alleged deliberate indifference and that such indifference was the "moving force" behind the deprivation of any constitutional rights or that the City maintained a widespread custom or policy that caused Gillespie's death. See *Piotrowski*, 237 F.3d at 583 ("Difficult as these facts are, however, they do not suffice to carry the heavy burden that a plaintiff must bear in establishing municipal culpability and causation."). Accordingly, the City's motion to dismiss the § 1983 claims against it is granted.

## C. Claims Under State Law

Generally, governments and government agencies are immune from suit, unless an exception is provided by statute. The tort liability of the state of Texas and its political subdivisions, such as the City, is strictly limited. See *City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex. 1994). In Texas, the Texas Tort Claims Act (the "Act"), TEX. CIV. PRAC. & REM. CODE § 101.001, *et seq*., provides the authority to bring an action, in certain limited circumstances, against a governmental unit within the state. The Act provides, "[i]f a suit is filed under [the Act] against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." *Id*. § 101.106(e); see

also *id*. § 101.106(a) (The suit "constitutes an irrevocable election" and "forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter."). "Governmental unit" is defined as "a political subdivision of this state, including any city . . . ." *Id*. § 101.001(3)(B).

The plaintiffs have asserted tort causes of action against the City, a governmental unit, and two employees of the City, Aaron and Chandler. *See generally* Complaint. Therefore, the Act mandates the dismissal, on the motion of the defendants, of the plaintiffs' Texas state-law tort claims against Aaron and Chandler.

The City argues that, as a state governmental entity, it is immune from state law tort claims. Motion at 24-25. Local governmental entities like the City "perform only governmental functions and are immune from tort suits unless their immunity has been waived by statute." *Garcia v. Maverick County*, 850 S.W.2d 626, 628 (Tex. App. – San Antonio 1993, writ denied). Governmental immunity has not been waived for intentional torts. *See* TEX. CIV. PRAC. & REM. CODE § 101.057(2); see also *Hawsey v. Louisiana Department of Social Services*, 934 S.W.2d 723, 726 (Tex. App. – Houston [1st Dist.] 1996, writ denied).

Under the Act, local government entities such as the City can be held liable in negligence only for (1) property damage, personal injury, and death arising from the operation or use of a motor-driven vehicle or equipment and (2) personal injury and

death caused by a condition or use of tangible personal or real property. *Martinez v. Hardy*, 864 S.W.2d 767, 772 (Tex. App. – Houston [14th Dist.] 1993, no writ) (citing Tex. Civ. Prac. & Rem. Code Ann. § 101.021). Neither of these exceptions to sovereign immunity applies in this case. See *City of Hempstead v. Kmiec*, 902 S.W.2d 118, 122 (Tex. App. – Houston [1st Dist.] 1995, no writ). A failure to adopt an allegedly proper policy simply does not waive sovereign immunity. *Ramos v. Texas Department of Public Safety*, 35 S.W.3d 723, 733 (Tex. App. – Houston [1st Dist.] 2000, writ denied). Therefore, all of the plaintiffs' claims for damages against the City under state law are dismissed.

III.  <u>CONCLUSION</u>

For the reasons discussed above, the motion to dismiss is **GRANTED**. Judgment for the defendants will be entered separately.

**SO ORDERED.**

March 26, 2019.

A. JOE FISH
**A. JOE FISH**
**Senior United States District Judge**